# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAYLA O'BRIEN, | : Case No.: |
| | :     1:20cv272 |
| Plaintiff, | : |
| | : |
| v. | : |
| | : **Jury trial demanded** |
| GANNON UNIVERSITY and CHRISTEN DIERKEN, | : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT

Plaintiff, Kayla O'Brien ("O'Brien"), files the following Complaint against Defendant Gannon University ("Gannon") and Defendant Christen Dierken ("Dierken") (collectively "Defendants").

## INTRODUCTION

1. O'Brien is a talented student and athlete. In high school, she fell in love with Gannon because of its campus, its nursing program and because she had been recruited by Coach Christen Dierken to join Gannon's Women's Wrestling Team (the "Team").

2. O'Brien is also a qualified person with disabilities. As set forth more fully below, when the Defendants learned of her disabilities, they engaged in an increasingly intense campaign of discrimination, retaliation and abuse culminating in her dismissal from the Team and the ultimate inability for her to continue her education at Gannon.

## THE PARTIES

3. Gannon is a private, coeducational Catholic university with a principle place of business in Erie, Pennsylvania.

1

4. Dierken is an adult individual, head coach of Gannon's Women's Wrestling Team, and a resident of Erie County, Pennsylvania. At all relevant times, Dierken was acting within the course and scope of her employment for Gannon, and thus Gannon is liable for her actions under the doctrine of *respondeat superior*.

5. O'Brien is an adult individual and a resident of Vienna, Virginia.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1343 because some of O'Brien's claims arise under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. ("Rehabilitation Act").

7. Venue is proper pursuant to 28 U.S.C. § 1391 because (i) Gannon and Dierken reside within this judicial district, and (ii) the vast majority of the events giving rise to O'Brien's claims occurred in this judicial district.

8. In addition, this Court has diversity jurisdiction under 28 U.S.C. § 1332 because (i) O'Brien is a citizen of Virginia and both Defendants are citizens of Pennsylvania, and (ii) the amount at issue is more than $75,000, exclusive of interest and costs.

## BACKGROUND

9. Gannon's mission states, in part, "Inspired by the Catholic Intellectual Tradition, we offer a comprehensive, values-centered learning experience that emphasizes faith, leadership, *inclusiveness and social responsibility*."[1] (emphasis added).

10. Gannon receives federal financial assistance in the form of direct grants and student financial aid.

---

[1] https://www.gannon.edu/student-life/a-catholic-university/university-mission/.

11. Gannon hired Dierken as the head Women's Wrestling Coach in April of 2018. Dierken began recruiting O'Brien for the Team later that year.

12. Gannon was so impressed by O'Brien's athletic and academic accomplishments that it awarded her the following scholarships: an academic scholarship of $16,000 a year; an athletic scholarship of $10,000 a year; and an annual housing award of $2,000 a year.

13. When O'Brien enrolled at Gannon, she and Gannon became bound by the terms and conditions of her contracts with Gannon, including the contract known as the Student Handbook. A true and correct copy is attached as **Exhibit A**.

14. In June of 2019, a few months prior to O'Brien's arrival as a first-year student on Gannon's campus, Dierken held an on-campus summer wrestling camp, in which O'Brien participated.

15. During the summer wrestling camp, O'Brien informed Dierken of her health impairments that substantially limited one or more major life activities, including anxiety, ADHD, and seasonal depression.

16. At or around this time, O'Brien provided Dierken with a record of her individualized education program at Gannon and completed paperwork to authorize O'Brien to take certain medications for her disabilities without running afoul of NCAA rules.

17. Almost immediately after O'Brien informed Dierken of her disabilities, Dierken's attitude toward and treatment of O'Brien became hostile and discriminatory. Within days of learning of O'Brien's health conditions, Dierken immediately expressed regret to her staff that she had recruited O'Brien and labeled her "exhausting" during the June 2019 wrestling camp.

18. Once the fall 2019 semester began, Dierken continued her pattern of hostility and discrimination toward O'Brien. As set forth below, much of Dierken's conduct reflected her discriminatory animus and thought processes surrounding people with disabilities.

19. Dierken cultivated a culture of fear and abuse on the Team by engaging in reckless and troubling behaviors, establishing loyalty as a core value for those who wanted to remain on the Team, shielding loyal or favored Team members from her abuse, and targeting others.

20. Following O'Brien's disclosure of her disabilities, O'Brien became Dierken's target.

21. During the fall of 2019, Dierken held "mentorship meetings" with individual Team members. During her meetings with O'Brien, Dierken frequently told O'Brien, who is diagnosed with clinical anxiety, that she was "too anxious" and "too emotional or sensitive."

22. Dierken would also frequently and contemptuously "diagnose" other members of the wrestling Team with mental health conditions in front of O'Brien, telling them that they "had ADHD" and making similar comments in a negative and disapproving manner.

23. After O'Brien disclosed her disabilities and sought accommodation, Dierken spoke disparagingly about O'Brien to members of the Team, invoking the concept of "loyalty" (or lack of loyalty) to speak about O'Brien.

24. During van rides to and from competitions, if O'Brien was not present, Dierken solicited negative feedback about O'Brien from her teammates asking questions like "what doesn't everyone like about Kayla?"

25. Dierken participated in these conversations by feeding O'Brien's teammates with misleading, untrue, and thinly veiled hypothetical comments disparaging her disabilities. For

4

example, Dierken talked about telling a "certain someone" that she needed to "get help for her problems" and that the "certain someone" did not visit the counselors.

26. Following Dierken's lead, some of O'Brien's teammates treated her with aggression and hostility. When she met with Dierken about her concerns, Dierken told her that it "was all in her head."

27. Just prior to an August 2019 Team retreat, O'Brien texted Dierken to notify her that she was experiencing adverse side effects related to the medication she takes for her disabilities and that her physicians were struggling to find the correct medication balance.

28. During the retreat, O'Brien asked Dierken for a reasonable accommodation relating to her documented disabilities. Dierken then secretly wrote O'Brien up for requesting an accommodation for her disabilities.

29. Around the same time, Dierken began requiring the Team to attend mandatory religious sessions with "spiritual parents" who had been brought in by Dierken. These "spiritual parents" were neither Roman Catholic (Gannon is a Catholic institution and O'Brien was raised Catholic), nor officially sanctioned by either Gannon or the Erie Diocese.

30. O'Brien and her family lodged concerns about these mandatory non-Catholic religious requirements, as they were not comfortable with these "spiritual parents."

31. In response to O'Brien's concerns, Dierken reluctantly ceased the required religious sessions. However, Defendants proceeded to retaliate against O'Brien, and Dierken intensified her campaign to harass and eventually eliminate O'Brien from Gannon's campus.

32. During the fall session of 2019 (e.g., the first semester of O'Brien's freshman year), Dierken repeatedly told various wrestlers, O'Brien's teammates and peers, that she was "too much work" and "disloyal."

33.     In late September of 2019, O'Brien voluntarily confessed to Dierken that she had consumed alcohol at an on-campus party, a violation of Team rules.

34.     It is not unusual for first-year college students to consume alcohol at parties. Indeed, upon information and belief, over the years many Gannon student athletes have engaged in similar conduct.

35.     In response to her confession of underage drinking, Dierken required O'Brien to plead her case to her teammates. Dierken further required the Team to vote on what O'Brien's sanctions should be, a situation of public humiliation and shaming that no other Team members have had to go through, previously or since.

36.     Non-disabled student athletes who had not lodged complaints but who had engaged in similar or more severe violations of Team rules or university regulations were not publicly humiliated and did not have their sanctions decided by their teammates.

37.     On November 15, 2019, O'Brien was receiving treatment from a trainer for an injury. O'Brien brought a friend to her treatment, and they engaged in joking and banter. O'Brien jokingly commented to her friend that she was going to be "throwing hands" if she was unable to wrestle due to her injury.

38.     Even though the comment was a joke not directed at the trainer, the trainer reported the incident to Dierken. The trainer reported that O'Brien was disrespectful during the session because she rolled her eyes two times, and the trainer felt threatened by the comment.

39.     Several days passed after the report, and then Dierken met with O'Brien on November 19, 2019. During that meeting, Dierken required O'Brien to execute a written Student-Athlete Behavior plan. According to that plan, O'Brien was suspended from the wrestling Team for two weeks (returning December 4, 2020) and was referred to the counseling center.

40. Although O'Brien had been joking with a friend, and her comment was not directed at the trainer, she regretted that the trainer had been offended. O'Brien apologized to the trainer, who accepted her apology.

41. On November 21, 2019, a licensed clinical psychologist from the Gannon counseling center emailed Lisa McGuirk, Gannon's Director of Athletics ("McGuirk"), to report that O'Brien had expressed a number of concerns about Dierken that "could be construed as mental/emotional/physical abuse" and that the psychologist felt obligated to alert McGuirk to investigate O'Brien's concerns.

42. McGuirk had a reported history of tolerating allegedly abusive women's coaches, which tolerance had become public via media reporting.

43. Consistent with her history, McGuirk intentionally failed and refused to appropriately address Dierken's unlawful conduct, choosing instead to focus on eliminating O'Brien from Gannon athletics.

44. In reckless and intentional disregard for O'Brien's rights, McGuirk did not undertake any investigation of Dierken as a result of the report from the clinical psychologist.

45. On November 26, 2019, O'Brien and her parents personally met with McGuirk to discuss their concerns of discrimination and retaliation.

46. On November 27, after meeting with the O'Brien family, and having previously received the e-mail outlining the clinical psychologist's concerns and recommendations, McGuirk furthered Gannon's retaliatory pattern and referred O'Brien to the Office of Student Conduct for the "throw hands" incident.

47. Contrary to the written Student-Athlete Behavior Plan under which O'Brien was suspended for two weeks, Dierken then indefinitely extended O'Brien's suspension from the Team, allegedly pending the results of the student conduct process.

48. As a result of the referral to the student conduct office, Sue Majocka, Gannon's Student Conduct Officer ("Majocka"), reached out to O'Brien on December 9 and directed her to report to student conduct on December 10. O'Brien was advised to be prepared to defend herself and provide any supporting documentation or statements, and to familiarize herself with the Gannon Student Handbook.

49. When Majocka met with O'Brien about the incident on December 10, 2019, contrary to the rights granted in the Student Handbook, Majocka did not investigate the issue, interview the witnesses O'Brien brought with her, accept O'Brien's supporting documentation, or gather relevant information.

50. Majocka concluded the student conduct process with a determination that the comment was inappropriate, even if O'Brien was joking.

51. Tellingly, the student conduct office determined that O'Brien's appropriate sanction was a mere written warning and a recommendation for counseling. No additional disciplinary action was contemplated.

52. Under the Student Handbook contract, O'Brien attempted to appeal this wrongful determination. Again, Gannon denied O'Brien the process promised in the Student Handbook and did not allow the appeal.

53. Even after the student conduct process concluded, in an intentional and/or deliberately indifferent violation of O'Brien's rights to be free from unlawful discrimination and

8

retaliation, Defendants continued to indefinitely suspend O'Brien from the wrestling Team, despite the written Student-Athlete Behavior Plan suspending O'Brien only until December 4, 2020.

54. Non-disabled student athletes at Gannon who engaged in, or were accused of, far more serious conduct received different and better treatment than O'Brien.

55. For example, on December 6, 2019, O'Brien was physically assaulted by a fellow member of the Team during a home wrestling meet. The other wrestler jumped up, grabbed O'Brien and physically shook her until the other wrestler was restrained and removed by other teammates.

56. Despite engaging in an actual physical assault of a teammate, Defendants suspended this other wrestler a mere two weeks and she remained on the Team and was able to participate in team activities.

57. Upon information and belief, other student athletes have been found responsible for underage drinking and actual assaults and other violations of rules yet have not suffered the adverse consequences that O'Brien suffered. Upon information and belief, these other student athletes had not disclosed disabilities and/or engaged in protected activity.

58. During O'Brien's indefinite suspension, Dierken refused to speak to her and continued to target her.

59. Dierken told O'Brien's peers and Team members that they would be viewed as "disloyal" and they could be "ruined" if they continued to socialize with O'Brien, who Dierken viewed – and identified to other student athletes and managers – as the "enemy."

60. With Dierken's encouragement and consistent with Defendant's intentional discrimination and retaliation, O'Brien suffered repeated harassment by some of her teammates.

61. For example, following Dierken's targeting, O'Brien was aggressively accosted at the door to her residence hall room by three other women student wrestlers seeking to harass and intimidate her on December 12, 2019.

62. O'Brien immediately reported this threat to Majocka via e-mail on December 12, 2019 and requested guidance. Majocka did not respond.

63. In late December 2019, as a result of all these events, and in order to appeal her student conduct censure, O'Brien was compelled to hire legal counsel and informed Defendants that she had done so.

64. O'Brien again reached out to Majocka on January 5, asking if she had received her earlier e-mail. Majocka responded the following day and advised O'Brien to contact Gannon University Public Safety if she felt threatened.

65. As a result of Dierken's targeting, discrimination and retaliation, facing threats and confrontation from fellow Team members, and following Majocka's recommendation, O'Brien filed a harassment complaint with Gannon Public Safety on January 11, 2020 in fear for her personal safety. She specifically requested that Dierken not be made aware that she filed this complaint, for fear of retaliation.

66. Despite several complaints and reports about Dierken's misconduct, discrimination and retaliation, and as a result of intentional discrimination, retaliation and/or deliberate indifference, Gannon never conducted an official investigation into Dierken until March of 2020, when it retained outside counsel to perform an investigation after O'Brien's attorney filed a formal notice on February 19, 2020 documenting multiple disability-related concerns of harassment and retaliation.

67. At the time O'Brien notified Gannon that she had retained counsel, she had not been dismissed from the Team. To the contrary, Gannon continued to publicize O'Brien on its roster as a member of the Team.

68. During the investigation that occurred after O'Brien retained counsel, Dierken admitted to Gannon's independent investigator that she never followed up with O'Brien after receiving the results of the student conduct process about rejoining the Team or the status of her suspension, even though under the written Student-Athlete Behavior Plan the suspension was to end December 4, 2019.

69. Through the investigation and the entire Spring 2020 semester, Defendants continued to publicize that O'Brien was a member of the Team.

70. During the investigation, Gannon learned of conduct by Dierken that demonstrated willingness to manipulate the Team and her reckless judgment. Several examples include:

    a. Gannon learned that Dierken brought her two very young (infant and toddler) children to practice without proper supervision, expecting the Team to watch the children, or risk falling into her disfavor.

    b. Gannon learned through video evidence that, on at least one occasion, Dierken breastfed her child while driving a Gannon University van filled with student athletes to Erie from Pittsburgh, even asking the student in the passenger seat (who had just suffered a concussion) to take the wheel while the child latched. A student reported this to McGuirk but no disciplinary action was taken.

    c. Gannon learned that Dierken required the student athletes to participate in a tunnel activity that involved physical slapping of buttocks.

11

    d. Gannon learned that Dierken promulgated a "Miss Piggy" award given to the wrestler who gained the most weight during the year.

71. Despite learning these facts and knowing that Dierken labeled O'Brien the enemy to her teammates after she disclosed her disabilities, Gannon failed and refused to take appropriate action. Instead, Gannon deliberately and intentionally perpetuated the discrimination and retaliation.

## LOSS OF SCHOLARSHIP AND PLACE ON THE TEAM

72. Despite the lack of a decision and/or communication from Dierken, based on Defendants' actions concerning O'Brien, including her continued inclusion on the Gannon Women's Wrestling website and roster, O'Brien believed that she would continue to wrestle for Gannon during the 2020-21 school year and beyond.

73. This belief was confirmed by O'Brien's April 5, 2020 Financial Aid Award Letter issued by Gannon regarding financial aid for the 2020-2021 school year. This letter confirmed that O'Brien would be receiving a $10,000 wrestling scholarship for the year, in addition to a $16,000 academic scholarship and a $2,000 housing award.

74. The above-described financial aid award was reflected in Gannon's online portal through July 2020.

75. Then, on June 30, 2020, the last possible day under NCAA rules, O'Brien received an email from Gannon's financial aid office stating that her women's wrestling scholarship was not being renewed for the 2020-21 school year and notifying her of her right to appeal.

76. This communication revoking her scholarship was the first official notification that O'Brien had received regarding her place on the Team since November of 2019.

77. O'Brien repeatedly emailed Dierken asking for information about the scholarship and her place on the Team. Dierken failed and refused to respond.

78. O'Brien, through her attorneys, appealed the decision and an appeal hearing was scheduled for July 27, 2020.

79. Shortly before the appeal hearing, Gannon produced hundreds of pages of documentation to O'Brien's counsel, including the investigation report, forcing O'Brien to incur considerable expense to prepare for the hearing.

80. Less than two hours before the hearing, Gannon cancelled the hearing and informed O'Brien that her athletic scholarship for the upcoming school year only would be reinstated. Gannon also informed her that she would not be permitted to wrestle and that she had been removed from the Team under the pretext of the student conduct issue, which had resulted in a mere warning.

81. Gannon's unlawful actions resulted in an end to O'Brien's athletic career, the removal of her athletic scholarship in future years, and the end of her housing allowance at Gannon.

82. As a result of the deliberate pattern of intentional discrimination and retaliation, O'Brien justifiably felt unsafe, abused, and betrayed by Gannon.

83. Based on Defendants' pattern of conduct, the conditions of her educational and athletic environment became so objectively and subjectively intolerable that she could not complete her education at Gannon.

84. As a direct result of Defendants' unlawful actions, O'Brien was forced to withdraw from Gannon and attend a different school.

13

## GANNON'S CONTRACTUAL OBLIGATIONS

85. Gannon, through its non-discrimination policy and other publications, promised that "Gannon University does not discriminate on the basis of disability by excluding people with disabilities from participation in University programs or activities" under the ADA or the Rehabilitation Act.

86. Gannon's Student Handbook further set forth its "Policy of Equal Opportunity," which states: "It is the policy of Gannon University to affirmatively implement equal opportunity to all qualified applicants and existing students. In administering its affairs, the University shall not discriminate against any person on any basis prohibited by law." Ex. A, p. 4.

87. It goes on to say, "Gannon University does not discriminate on the basis of disability by excluding people with disabilities from participation in University programs or activities." Ex. A.

88. The Student Handbook later defines "discrimination" as "Any act or failure to act that is based upon an individual's or group's actual or perceived status that is sufficiently severe that it limits or denies the ability to participate in or benefit from the University's educational program or activities." Ex. A., p. 19.

89. The Student Handbook also promises that Gannon will not retaliate: "The University will not tolerate retaliation. Retaliation against any person or group who makes a complaint, cooperates with an investigation, or participates in a resolution process is a violation of University policy. Retaliation can take many forms, including continued abuse or violence, bullying, threats, and intimidation." Ex. A, p. 22.

## COUNT I

### Disability Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. against Gannon University

90. All the preceding paragraphs are herein fully incorporated by reference.

91. O'Brien was and is a qualified individual with a disability as defined by the ADA and is medically diagnosed as such. She also has a record of being disabled, and being regarded as disabled, by Gannon.

92. O'Brien's diagnoses, including anxiety, ADHD, and seasonal depression, are physical and mental impairments that substantially limit one or more major life activities and therefore are disabilities under 42 U.S.C. § 12102.

93. As set forth above, Gannon unlawfully and intentionally discriminated against O'Brien due to her disabilities in violation of the ADA.

94. The actions, and inactions, of Gannon, through its authorized agents and employees (including Dierken), constituted knowing, malicious, recklessly indifferent, intentional discrimination on the basis of disability in violation of the ADA.

95. Gannon deprived O'Brien of the benefits and privileges of its programs and activities, including its athletic program, and through her constructive dismissal from its academic program.

96. As a result of Gannon's actions, O'Brien is entitled to such affirmative relief as may be appropriate, including but not limited to compensatory damages, including economic and non-economic harm, and attorneys' fees.

15

## COUNT II

### Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. against all Defendants

97. All the preceding paragraphs are herein fully incorporated by reference.

98. O'Brien was and is a qualified individual with a disability as defined by the ADA and is medically diagnosed as such. She also has a record of being disabled, and being regarded as disabled, by Defendants.

99. O'Brien's diagnoses, including anxiety, ADHD, and seasonal depression are physical and mental impairments that substantially limit one or more major life activities and therefore are disabilities under 42 U.S.C. § 12102.

100. As set forth above, Defendants unlawfully and intentionally discriminated against O'Brien due to her disabilities in violation of the ADA.

101. O'Brien engaged in protected activity, including complaining of unlawful discrimination and retaliation.

102. The actions, and inactions, of Defendants constituted knowing, malicious, recklessly indifferent, intentional retaliation under the ADA.

103. Defendants deprived O'Brien of the benefits and privileges of Gannon's programs and activities, including its athletic program, and through her constructive dismissal from its academic program.

104. As a result of Defendants' actions, O'Brien is entitled to such affirmative relief as may be appropriate, including but not limited to compensatory damages, including economic and non-economic harm, and attorneys' fees.

## COUNT III

### Disability Discrimination in Violation of Section 504 of the Rehabilitation Act of 1973 against Gannon University

105. All the preceding paragraphs are herein fully incorporated by reference.

106. Gannon receives federal funding.

107. O'Brien was and is a qualified individual with a disability under the Rehabilitation Act and is medically diagnosed as such. She also has a record of being disabled, and being regarded as disabled, by Gannon.

108. O'Brien's diagnoses, including anxiety, ADHD, and seasonal depression are physical and mental impairments that substantially limit one or more major life activities and therefore are disabilities under the Rehabilitation Act.

109. As set forth above, Gannon unlawfully and intentionally discriminated against O'Brien due to her disabilities in violation of the Rehabilitation Act.

110. The actions, and inactions, of Gannon, through its authorized agents and employees (including Dierken), constituted knowing, malicious, recklessly indifferent, intentional discrimination on the basis of disability in violation of the Rehabilitation Act.

111. Gannon deprived O'Brien of the benefits and privileges of its programs and activities, including its athletic program, and through her constructive dismissal from its academic program.

112. As a result of Gannon's actions, O'Brien is entitled to such affirmative relief as may be appropriate, including but not limited to compensatory damages, including economic and non-economic harm, and attorneys' fees.

## COUNT IV

## Retaliation in Violation of Section 504 of the
## Rehabilitation Act of 1973 against Gannon University

113. All the preceding paragraphs are herein fully incorporated by reference.

114. O'Brien was and is a qualified individual with a disability and is medically diagnosed as such. She also has a record of being disabled, and being regarded as disabled, by Gannon.

115. O'Brien's diagnoses, including anxiety, ADHD, and seasonal depression are physical and mental impairments that substantially limit one or more major life activities and therefore are disabilities.

116. As set forth above, Gannon unlawfully and intentionally discriminated against O'Brien due to her disabilities in violation of the Rehabilitation Act.

117. O'Brien engaged in protected activity, including complaining of unlawful discrimination and retaliation.

118. The actions, and inactions, of Gannon constituted knowing, malicious, recklessly indifferent, intentional retaliation in violation of the Rehabilitation Act.

119. Gannon deprived O'Brien of the benefits and privileges of Gannon's programs and activities, including its athletic program, and through her constructive dismissal from its academic program.

120. As a result of Gannon's actions, O'Brien is entitled to such affirmative relief as may be appropriate, including but not limited to compensatory damages, including economic and non-economic harm, and attorneys' fees.

## COUNT V

### Breach of Contract against Gannon University

121. All the preceding paragraphs are herein fully incorporated by reference.

122. The relationship between O'Brien and Gannon was contractual. The contract consisted of several documents, including Gannon's policies and the Student Handbook (collectively "the Contract"). Ex. A.

123. The Contract between O'Brien and Gannon was and is valid and enforceable.

124. The Contract promised fair disciplinary processes that would include an investigation, gathering of relevant information, calling of witnesses and an appeal process.

125. The Contract promised that Gannon would not discriminate or retaliate based on disability.

126. The Contract promised that Gannon would not retaliate for complaints or concerns raised by students.

127. As set forth more fully above, Gannon breached all of these promises.

128. As a result of Gannon's breaches, O'Brien has incurred and continues to incur damages in the form of lost academic, athletic and housing scholarships among other damages.

### Request for Relief

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff and against Defendants and award the following relief:

- Compensatory and consequential damages, including for emotional distress;
- Pre-judgment and post-judgment interest at the highest lawful rate;
- Attorneys' fees and costs of this action; and
- Any such further relief as the Court deems appropriate.

Respectfully submitted,

STRASSBURGER McKENNA GUTNICK
& GEFSKY

By: /s/ Danielle L. Dietrich
  Danielle L. Dietrich
  Pa. ID. No. 200767
  Pamela W. Connelly
  Pa. ID No. 76395
  Four Gateway Center, Suite 2200
  444 Liberty Avenue
  Pittsburgh, PA 15222
  T - (412) 281-5423
  F - (412) 281-8264

*Counsel for Plaintiff*